# EXHIBIT A

SALDUTTI LAW GROUP
Thomas O'connell, Esquire - 006871992
800 North Kings Highway, Suite 300
Cherry Hill, NJ 08034
(856) 779-0300
FAX: (856) 779-3362
Attorneys for Plaintiff

| | |
|---|---|
| CUSTOMERS BANK,<br><br>　　　　Plaintiff,<br><br>v.<br><br>COMMONWEALTH LAND TITLE INSURANCE<br>COMPANY, FIDELITY NATIONAL<br>FINANCIAL, INC., STONEGATE MORTGAGE<br>CORPORATION, HOME POINT FINANCIAL<br>CORPORATION, AS SUCCESSOR IN<br>INTEREST TO STONEGATE MORTGAGE<br>CORPORATION, AND JOHN DOES 1<br>THROUGH 5<br><br>　　　　Defendant(s). | SUPERIOR COURT OF NEW JERSEY<br>LAW DIVISION<br>CAMDEN COUNTY<br><br>DOCKET NO. L-628-17<br><br>Civil Action<br><br>SUMMONS |

From The State of New Jersey
To The Defendant(s) Named Above:   STONEGATE MORTGAGE CORPORATION
The plaintiff, named above, has filed a lawsuit against you in the Superior Court of New Jersey. The complaint attached to this summons states the basis for this lawsuit. If you dispute this complaint, you or your attorney must file a written answer or motion and proof of service with the deputy clerk of the Superior Court in the county listed above within 35 days from the date you received this summons, not counting the date you received it. (A directory of the addresses of each deputy clerk of the Superior Court is available in the Civil Division Management Office in the county listed above and online at http://www.judiciary.state.nj.us/pro se/10153_deputyclerklawref.pdf). If the complaint is one in foreclosure, then you must file your written answer or motion and proof of service with the Clerk of the Superior Court, Hughes Justice Complex, PO Box 971, Trenton, NJ 08625-0971. A filing fee payable to the Treasurer, State of New Jersey and a completed Case Information Statement (available from the deputy clerk of the Superior Court) must accompany your answer or motion when it is filed. You must also send a copy of your answer or motion to plaintiff's attorney whose name and address appear above, or to plaintiff, if no attorney is named above. A telephone call will not protect your rights; you must file and serve a written answer or motion (with fee of $175.00 and completed Case Information Statement) if you want the court to hear your defense.

If you do not file and serve a written answer or motion within 35 days, the court may enter a judgment against you for the relief plaintiff demands, plus interest and costs of suit. If judgment is entered against you, the Sheriff may seize your money, wages or property to pay all or part of the judgment.

If you cannot afford an attorney, you may call the Legal Services office in the county where you live or the Legal Services of New Jersey Statewide Hotline at 1-888-LSNJ-LAW (1-888-576-5529). If you do not have an attorney and are not eligible for free legal assistance, you may obtain a referral to an attorney by calling one of the Lawyer Referral Services. A directory with contact information for local Legal Services Offices and Lawyer Referral Services is available in the Civil Division Management Office in the county listed above and online at http://www.judiciary.state.nj.us/prose/10153_deputyclerklawref.pdf.

Dated: 03/22/2017

　　　　　　　　　　　　　　　　Michelle M. Smith
　　　　　　　　　　　　　　　　Michelle M. Smith, Clerk of the Superior Court

Name of Defendant to be Served:　　　　STONEGATE MORTGAGE CORPORATION
　　　　　　　　　　　　　　　　C/O The Corporation Trust Company
　　　　　　　　　　　　　　　　820 Bear Tavern Road
　　　　　　　　　　　　　　　　West Trenton, NJ 08628

**Appendix XII-B1**

| CIVIL CASE INFORMATION STATEMENT (CIS) Use for Initial Law Division Civil Part pleadings (not motions) under *Rule* 4:5-1 Pleading will be rejected for filing, under *Rule* 1:5-6(c), if information above the black bar is not completed or attorney's signature is not affixed | FOR USE BY CLERK'S OFFICE ONLY |
|---|---|
| | PAYMENT TYPE: ☐CK ☐CG ☐CA |
| | CHG/CK NO. |
| | AMOUNT: |
| | OVERPAYMENT: |
| | BATCH NUMBER: |

| ATTORNEY / PRO SE NAME | TELEPHONE NUMBER | COUNTY OF VENUE |
|---|---|---|
| Robert L. Saldutti, Esquire | (856) 779-0300 | Camden |

| FIRM NAME (if applicable) | DOCKET NUMBER (when available) |
|---|---|
| Saldutti Law Group | L-628-17 |

| OFFICE ADDRESS | DOCUMENT TYPE |
|---|---|
| 800 N. Kings Highway, Suite 300 Cherry Hill, NJ 08034 | Amended Complaint |
| | JURY DEMAND   ☐ YES   ■ No |

| NAME OF PARTY (e.g., John Doe, Plaintiff) | CAPTION |
|---|---|
| Customers Bank, Plaintiff | Customers Bank, Plaintiff v. Commonwealth Land Title Insurance Company, Fidelity National Financial, Inc., Stonegate Mortgage Corporation, Home Point Financial Corporation, et als. Defendants |

| CASE TYPE NUMBER (See reverse side for listing) | HURRICANE SANDY RELATED? | IS THIS A PROFESSIONAL MALPRACTICE CASE?   ☐ YES   ■ NO |
|---|---|---|
| 699 | ☐ YES   ■ NO | IF YOU HAVE CHECKED "YES," SEE *N.J.S.A.* 2A:53A -27 AND APPLICABLE CASE LAW REGARDING YOUR OBLIGATION TO FILE AN AFFIDAVIT OF MERIT. |

| RELATED CASES PENDING? | IF YES, LIST DOCKET NUMBERS |
|---|---|
| ■ YES   ☐ No | L-2482-13; L-1675-13; L-3910-13; and L-3221-13 et als. |

| DO YOU ANTICIPATE ADDING ANY PARTIES (arising out of same transaction or occurrence)? | NAME OF DEFENDANT'S PRIMARY INSURANCE COMPANY (if known) |
|---|---|
| ☐ Yes   ■ No | ☐ NONE   ■ UNKNOWN |

| THE INFORMATION PROVIDED ON THIS FORM CANNOT BE INTRODUCED INTO EVIDENCE. |
|---|

CASE CHARACTERISTICS FOR PURPOSES OF DETERMINING IF CASE IS APPROPRIATE FOR MEDIATION

| DO PARTIES HAVE A CURRENT, PAST OR RECURRENT RELATIONSHIP? | IF YES, IS THAT RELATIONSHIP: |
|---|---|
| ☐ Yes   ■ No | ☐ EMPLOYER/EMPLOYEE   ☐ FRIEND/NEIGHBOR   ■ OTHER (explain) ☐ FAMILIAL   ☐ BUSINESS |

| DOES THE STATUTE GOVERNING THIS CASE PROVIDE FOR PAYMENT OF FEES BY THE LOSING PARTY?   ■ YES   ☐ No |
|---|

USE THIS SPACE TO ALERT THE COURT TO ANY SPECIAL CASE CHARACTERISTICS THAT MAY WARRANT INDIVIDUAL MANAGEMENT OR ACCELERATED DISPOSITION

| DO YOU OR YOUR CLIENT NEED ANY DISABILITY ACCOMMODATIONS? | IF YES, PLEASE IDENTIFY THE REQUESTED ACCOMMODATION |
|---|---|
| ☐ Yes   ■ No | |
| WILL AN INTERPRETER BE NEEDED? | IF YES, FOR WHAT LANGUAGE? |
| ☐ Yes   ■ No | |

I certify that confidential personal identifiers have been redacted from documents now submitted to the court, and will be redacted from all documents submitted in the future in accordance with *Rule* 1:38-7(b).

ATTORNEY SIGNATURE:



Side 2

# CIVIL CASE INFORMATION STATEMENT
## (CIS)
Use for initial pleadings (not motions) under *Rule* 4:5-1

---

**CASE TYPES** (Choose one and enter number of case type in appropriate space on the reverse side.)

**Track I - 150 days' discovery**
151   NAME CHANGE
175   FORFEITURE
302   TENANCY
399   REAL PROPERTY (other than Tenancy, Contract, Condemnation, Complex Commercial or Construction)
502   BOOK ACCOUNT (debt collection matters only)
505   OTHER INSURANCE CLAIM (including declaratory judgment actions)
506   PIP COVERAGE
510   UM or UIM CLAIM (coverage issues only)
511   ACTION ON NEGOTIABLE INSTRUMENT
512   LEMON LAW
801   SUMMARY ACTION
802   OPEN PUBLIC RECORDS ACT (summary action)
999   OTHER (briefly describe nature of action)

**Track II - 300 days' discovery**
305   CONSTRUCTION
509   EMPLOYMENT (other than CEPA or LAD)
599   CONTRACT/COMMERCIAL TRANSACTION
603N   AUTO NEGLIGENCE – PERSONAL INJURY (non-verbal threshold)
603Y   AUTO NEGLIGENCE – PERSONAL INJURY (verbal threshold)
605   PERSONAL INJURY
610   AUTO NEGLIGENCE – PROPERTY DAMAGE
621   UM or UIM CLAIM (includes bodily injury)
699   TORT – OTHER

**Track III - 450 days' discovery**
005   CIVIL RIGHTS
301   CONDEMNATION
602   ASSAULT AND BATTERY
604   MEDICAL MALPRACTICE
606   PRODUCT LIABILITY
607   PROFESSIONAL MALPRACTICE
608   TOXIC TORT
609   DEFAMATION
616   WHISTLEBLOWER / CONSCIENTIOUS EMPLOYEE PROTECTION ACT (CEPA) CASES
617   INVERSE CONDEMNATION
618   LAW AGAINST DISCRIMINATION (LAD) CASES

**Track IV - Active Case Management by Individual Judge / 450 days' discovery**
156   ENVIRONMENTAL/ENVIRONMENTAL COVERAGE LITIGATION
303   MT. LAUREL
508   COMPLEX COMMERCIAL
513   COMPLEX CONSTRUCTION
514   INSURANCE FRAUD
620   FALSE CLAIMS ACT
701   ACTIONS IN LIEU OF PREROGATIVE WRITS

**Multicounty Litigation (Track IV)**

| | | | |
|---|---|---|---|
| 271 | ACCUTANE/ISOTRETINOIN | 292 | PELVIC MESH/BARD |
| 274 | RISPERDAL/SEROQUEL/ZYPREXA | 293 | DEPUY ASR HIP IMPLANT LITIGATION |
| 281 | BRISTOL-MYERS SQUIBB ENVIRONMENTAL | 295 | ALLODERM REGENERATIVE TISSUE MATRIX |
| 282 | FOSAMAX | 296 | STRYKER REJUVENATE/ABG II MODULAR HIP STEM COMPONENTS |
| 285 | STRYKER TRIDENT HIP IMPLANTS | 297 | MIRENA CONTRACEPTIVE DEVICE |
| 286 | LEVAQUIN | 299 | OLMESARTAN MEDOXOMIL MEDICATIONS/BENICAR |
| 287 | YAZ/YASMIN/OCELLA | 300 | TALC-BASED BODY POWDERS |
| 289 | REGLAN | 601 | ASBESTOS |
| 290 | POMPTON LAKES ENVIRONMENTAL LITIGATION | 623 | PROPECIA |
| 291 | PELVIC MESH/GYNECARE | | |

If you believe this case requires a track other than that provided above, please indicate the reason on Side 1, in the space under "Case Characteristics."

**Please check off each applicable category**   ☐ **Putative Class Action**   ☐ **Title 59**

---

**SALDUTTI LAW GROUP**
Robert L. Saldutti, Esquire
Thomas B. O'Connell, Esquire
800 N. Kings Highway, Ste 300
Cherry Hill, NJ 08034
(856) 779-0300
Attorneys for Plaintiff

| | |
|---|---|
| CUSTOMERS BANK,<br><br>             Plaintiff,<br><br>v.<br><br>COMMONWEALTH LAND TITLE INSURANCE COMPANY, FIDELITY NATIONAL FINANCIAL, INC., STONEGATE MORTGAGE CORPORATION, HOME POINT FINANCIAL CORPORATION, AS SUCCESSOR IN INTEREST TO STONEGATE MORTGAGE CORPORATION, AND JOHN DOES 1 THROUGH 5<br><br>             Defendant(s). | SUPERIOR COURT OF NEW JERSEY<br>LAW DIVISION<br>CAMDEN COUNTY<br><br>DOCKET NO. L-628-17<br><br>Civil Action<br><br>**FIRST AMENDED COMPLAINT** |

Plaintiff, Customers Bank ("Customers") by way of First Amended Complaint against Commonwealth Land Title Insurance Company ("Commonwealth"), Fidelity National Financial, Inc. ("Fidelity"), Stonegate Mortgage Corporation ("Stonegate Mortgage"), Home Point Financial Corporation, as Successor in Interest to Stonegate Mortgage Corporation ("Home Point"), and John Does 1-5, hereby says:

**The Parties**

1.     Customers is a bank authorized to conduct business in the State of New Jersey. Customers conducts business throughout the State of New Jersey, including Camden County.

2.     Stonegate Mortgage is a corporation authorized to do business in the State of New Jersey.  Stonegate Mortgage.

3.     Commonwealth and Fidelity (collectively, "the Commonwealth Defendants") are corporations authorized to conduct business in the State of New Jersey.

4.     Home Point is a corporation conducting business in New Jersey. Upon information and belief, Home Point has entered into an agreement to purchase and acquire Stonegate Mortgage and is the the successor-in-interest to Stonegate Mortgage.

### The Litigation

5.     Customers is a Plaintiff in the matter consolidated under case and caption Customers Bank v. Capital Financial Mortgage Corp., Docket No. L-1239-13 in the Superior Court of New Jersey, Camden County ("the Litigation").

6.     The Commonwealth Defendants are Defendants and Third-Party Plaintiffs in the Litigation. The Commonwealth Defendants previously asserted Counterclaims and Third-Party claims against Customers (collectively, "the Commonwealth Defendants' Counterclaim).

7.     Stonegate Mortgage is a Plaintiff in the Litigation.

### The Receivership and the Receiver's Claims

8.     At the outset of the Litigation, Customers filed an Order to Show Cause for the appointment of a Receiver over Capital Financial Mortgage Corp. ("Capital") and other Defendants in the Litigation. The Court granted Customers' application and appointed Michael Joyce, Esq. as appointed as the Receiver to marshal the assets of Capital and other Defendants named in the Litigation.

9.     As a result of the efforts of Customers Bank, the Receivership estate has recovered hundreds of thousands of dollars that remain in escrow with the Receiver. Stonegate Mortgage provided little, if any, contributions resulting in the creation of value to the Receivership Estate. As a result of the efforts of Customers Bank, the Court denied applications

for the release of Receivership funds to George Barnard and Kristin Barnard. Customers' efforts preserved the Receivership Estate and prevented waste. Stonegate Mortgage failed to oppose these requests for distributions, which would have caused diminution and waste to the Receivership estate by virtue of conveying funds from the Receivership Estate to the alleged beneficiaries of the Capital Financial fraud, for the use of, among other things, the alleged beneficiaries of the Capital fraud's costs and expenses related to the Litigation.

10.   As a result of the efforts of Customers Bank, the Court denied Stonegate Mortgage's application for funds in excess of $100,000.00 to be released to Stonegate Mortgage for unapproved litigation expenses.

11.   Although neither Stonegate Mortgage nor the Commonwealth Defendants have taken any action resulting in the creation of value or the prevention of waste of the Receivership assets, Stonegate Mortgage and the Commonwealth Defendants may be the ultimate beneficiaries of the Receivership funds resulting from Customers' actions.

12.   In 2013, the Receiver filed a claim against Horrow & Associates under case and caption Michael E. Joyce, Esq. v. Horrow & Associates, Docket No. CAM-L-4874-13 ("the Horrow Complaint").

13.   In 2013, the Receiver filed a claim against Sturdy Savings Bank under case and caption Michael E. Joyce, Esq. v. Sturdy Savings Bank, Docket No. CAM-4874-13 ("the Sturdy Complaint").

### The Litigation and Discovery

14.   During the course of the Litigation, the Commonwealth Defendants filed a Counterclaim and Third-Party Claims against Customers (collectively known as "the Commonwealth Defendants' Counterclaim").

15.     During the course of the Litigation and discovery related to the Commonwealth Defendants' Counterclaim, the Commonwealth Defendants sought discovery related to Customers' contractual agreement with Capital, including Customers' collateral and security interest in the form of a Maintenance Account over which Customers maintained exclusive possession and control and a perfected security interest, and in which Capital had no rights or benefits.

16.     In response to the Commonwealth Defendants' initial discovery requests, in April of 2014, Customers produced certified responses to discovery including the Master Repurchase Agreement between Customers and Capital identifying Customers' Security Interest in the Maintenance Account and Customers' contractual right of setoff in the Maintenance Account; Customers' filed UCC-1 in the assets of Capital, including any and all accounts maintained in Capital's name at Customers; and the signature card to the Maintenance Account identifying the exclusive signing authority of Customers' personnel to the Maintenance Account. Customers provided the Receiver with electronic copies of the discovery responses. The Receiver never subpoenaed Customers, never filed any claims against Customers, and never sought formal written discovery or deposition testimony from Customers.

17.     In response to Customers' production of discovery, the Commonwealth Defendants served additional discovery related to the Maintenance Account identifying the Maintenance Account by number. The Commonwealth Defendants' Second Set of Document Requests, served on or about March 11, 2014, sought "[a]ll documents related to Capital's accounts with Customers, including but not limited to [the Maintenance Account], account no. 5771375."

18.    In response the Commonwealth Defendants' ongoing discovery requests, Customers provided records of the Maintenance Account's receipt of all funds and all accounting records of the Maintenance Account, records of Capital's Fund Transfer Requests, records of the application of Maintenance Account funds as "curtailment" payments, and additional documentation confirming Customers' exclusive signing authority to the Maintenance Account funds. Customers provided the Receiver with electronic copies of the discovery responses.

19.    In response to the Commonwealth Defendants' fourth set of requests for documents, Customers certified:

> 1.    Warehouse borrowers are subject to the Credit Policies and Procedures previously produced as Customers 63237-63262. There are no separate Customer Identification Programs or Customer Due Diligence programs relating to warehouse borrowers other than the documents previously produced.
>
> By way of further explanation, as part of Customers Bank's Master Repurchase Agreements, warehouse borrowers must have Maintenance Accounts at Customers Bank. Maintenance Accounts, including Capital Financial's Maintenance Account, are restricted accounts under Customers' control.
>
> Customers requires that Maintenance Accounts, including Capital Financial's Maintenance Account, maintain a minimum balance for Customers to fund mortgage loans for the warehouse borrower.
>
> Funds from the Maintenance Account may be transferred, when requested, to cover the balance of closing costs not included in Customers' funding of mortgage loans according to its Master Repurchase Agreements. However, the Maintenance Account must retain the minimum balance at all times. If the transfer of funds would deplete the Maintenance Account below its minimum balance, no such transfer will occur. Funds from the Maintenance Account may be applied, automatically, to curtailments of aged, unsold loans according to the warehouse borrower's Master Repurchase Agreement. If funds from the Maintenance Account are less than the minimum required balance, the warehouse borrower is required to immediately deposit available funds to cover any shortfall.

Customers retains signing authority and the ability to transfer funds from the Maintenance Accounts, including Capital Financial's. See, e.g,, Customers 65876. Customers deposits any net proceeds from the sale of loans into the maintenance account after deducting principal, interest and fees owed. The warehouse borrower may deposit funds into the Maintenance Account, but any transfer of funds is under the control of Customers. The warehouse borrower may make a formal request, by a designated signer, for Customers to transfer funds from the warehouse borrower's Maintenance Account to an account designated by the warehouse borrower. Customers has produced these requests as Customers 26184-26196.

The only direct interaction between the warehouse borrower and the Maintenance Account is the warehouse borrower's ability to deposit funds into the Maintenance Account. Customers has previously produced all Maintenance Account activity of Capital Financial's Maintenance Account as Customers 25761-26184.

Capital Financial had no Demand Deposit Account at Customers. Capital Financial had no account from which Capital Financial could initiate wire transfers, funds transfers, or automated clearing house transactions. Capital Financial had no account at Customers Bank from which Capital could write checks or withdraw cash.

Customers provided the Receiver with electronic copies of the discovery responses.

20.    The Commonwealth Defendants solicited deposition testimony regarding the Maintenance Account.  The Commonwealth Defendants noticed the deposition for Customers' corporate designee on thirty-two (32) topics.  The deposition notice included the following topics which related to the Maintenance Account:

28 . . . . Customers Bank's determination of its damages in loss reserve, Customers Bank's recovery in connection with that suspected fraud, and the sale of loans included in the suspected fraud.

. . . .

32. . . . Customers Bank's alleged damages in this consolidated action.

21.    In response to the Commonwealth Defendants' deposition notice for Customers' corporate designee on thirty-two topics, Customers produced Glenn Hedde, the President of Warehouse Lending.  The Commonwealth Defendants and other parties deposed Hedde for four non-consecutive days of deposition, including questions about Customers' public disclosures and internal memoranda, produced in discovery, describing Customers' application of funds from the Maintenance Account to mitigate Customers' losses from the fraud perpetrated by Capital and other actors.  Stonegate Mortgage and Commonwealth appeared at the deposition of Hedde.  The Receiver declined to appear at the deposition of Glenn Hedde.

22.    Hedde testified about the application of the Maintenance Account funds on April 30, 2013.  Hedde testified that upon discovery of the fraud, funds from the Maintenance Account were applied to outstanding loans involved in the fraud.  Hedde testified that Capital had no ability to originate wires from the Maintenance Account.

23.    In response to Stonegate Mortgage's questions about the Maintenance Account, Hedde referenced the Curtailment Reports showing the application of the funds on April 30, 2013:

The best source, I think in the documents we provided, would've been a June 30 [curtailment] report, which was after all of the maintenance account money . . . was processed.

. . . . .

If you compare it to the May 31 report, you can determine – the change from May 31 to June 30 would have been the sale of the five loans.  And then I believe the April 30 report compared to March 31 would have showed the application of maintenance account funds.

24.    Hedde's testimony regarding the Maintenance Account continued:

Q.    And we're talking about an account that was maintained at Customers Bank relating to Capital Financial; is that right?

A.    Its account at Customers Bank that Capital Financial was the tax I.D. owner but not a signor on the account.

Q.    Right. When was that maintenance account depleted?

A.    I believe on April 30, 2013, we applied the funds to the various loans that were still on Customers' Bank warehouse facility.

Q.    Do you how much money was taken on that date?

A.    I believe it was something just shy of $1.5 Million Dollars.

Q.    Mr. Hedde, the reporter has handed you what she marked as Hedde – 62. Do you recognize this document, sir?

A.    I recognize it as one of our standard reports, yes.

Q.    Can you identify it please?

A.    It's a daily payment – external for the time period from 4/30/13 through 4/30/13.

Q.    So it's a snapshot of that day?

A.    It is payments that were applied that day, yes.

Q.    Is this the report that you were generally referring to a few minutes ago?

A.    For the approximate $1,462,683.46 was applied for the maintenance account on that day yes.

Q.    So this report depicts funds being applied from the maintenance account to these various loans that are listed on Hedde – 62; correct.

A.    Yes. The funds in the maintenance account were used as principal payments. . . .

. . . .

> A.   That was the day we posted and made the effective pay
> down on the application of the funds in the maintenance
> account.

25.   Multiple parties sought deposition testimony from additional Customers'

representatives about the Maintenance Account. Parties sought testimony from Customers'

Chief Risk Officer, Robert White ("White"), about the Maintenance Account during White's two

days of testimony. White testified

> [T]he Maintenance Account is an account that was set up by the
> bank. It is for all of our warehouse customers, where a portion of
> their funding for the spread on a loan gets retained by the bank.
> It's essentially a security deposit type account.

Stonegate Mortgage and Commonwealth appeared at the deposition of White. The

Receiver declined to appear at the deposition of Robert White.

26.   Like Hedde, White confirmed Customers' setoff of the Maintenance Account

funds upon the discovery of the fraud, explaining:

> There was a time when we set off against the monies in the
> maintenance account, yes, and applied it to the outstanding balance
> of . . . . Capital.

27.   The Commonwealth Defendants solicited testimony from Customers' Senior Vice

President of Warehouse Lending, Christopher Black, regarding the Maintenance Account. Black

testified about the Maintenance Account balance and application of curtailment payments.

Stonegate Mortgage and Commonwealth appeared at the deposition of White. The Receiver

declined to appear at the deposition of Black.

28.   In addition to Hedde, White, and Black, the Commonwealth Defendants sought

deposition testimony from Customers' employees Selena Rodriguez, Tina Adamovich, Jeremy

Diamond, Ken Blume, Scott Goodwin, Kim Strickland, Richard Kirk and Meredith Simonka, for

a total of nineteen (19) days of deposition testimony from eleven (11) Customers' employees.

Stonegate Mortgage and Commonwealth appeared at every deposition of a Customers' employee. The Receiver declined to appear at any depositions of Customers' employees.

29.     Customers deposed David Fili, the former President of Capital. Fili confirmed at his deposition that Capital had no ability to access Maintenance Account funds, which had to be requested from Customers. Fili confirmed that Customers had the ability to retain all Maintenance Account funds and apply funds to Capital's obligations to Customers. Stonegate Mortgage and Commonwealth appeared at the deposition of David Fili. The Receiver declined to appear at Fili's deposition.

30.     During the Litigation, counsel for Stonegate Mortgage, Michael Gottschlich, Esq., from the law firm of Barnes & Thornburg, LLP, acting as the agent of Stonegate Mortgage, had multiple phone conversations with counsel for Customers in which Gottschlich suggested that Customers re-visit the application of Maintenance Account funds for which Customers had provided certified discovery responses. Specifically, Gottschlich suggested Customers evaluate which loans presented the strongest claims in litigation based on consideration of (1) the different language in the New Jersey and Pennsylvania Closing Protection Letters, (2) whether or not Customers received a closing confirmation email for a particular loan; (3) whether or not the closing confirmation email received by Customers confirmed a particular loan as "closed" or "closed and funded;" or (4) what particular documents Customers had related to a particular loan.

31.     As Customers had applied the funds in 2013 based on the age of the outstanding loan, and provided discovery confirming same, Customers declined to consider Gottlich's suggestion to re-visit the application of Maintenance Account funds as part of litigation strategy, after the funds had already been applied, during the course of litigation.

32.    The Commonwealth Defendants produced an expert report and testimony of Patrick O'Keefe ("O'Keefe"). O'Keefe testified he was "perplexed" as to why Customers had not sued Capital's prior warehouse lender, Flagstar Bank ("Flagstar"), and why Stonegate Mortgage had not sued Customers. O'Keefe is not legally trained. Stonegate Mortgage was present at O'Keefe's deposition. The Receiver declined to appear at O'Keefe's deposition or pursue O'Keefe's legal theory.

33.    Customers produced the expert report of Stephen Scherf, CPA, identifying the application of Maintenance Account funds. The Receiver declined to appear at the deposition of Scherf.

34.    Customers moved for partial summary judgment against the Commonwealth Defendants. Customers' motion identified Customers' damages and the mitigation thereof with funds from the Maintenance Account. Customers' motion identified litigation in which Mortgage Services III and NYCB, purchasers of Capital loans, attempted and failed in their pursuit of claims against Customers alleging the legal theory suggested by O'Keefe. Customers' motion identified that after exchanging discovery, Mortgage Services III and NYCB stipulated to dismissals of their complaints. The Commonwealth Defendants were a party to the NYCB litigation.

35.    Customers' motion identified that Courts have repeatedly rejected claims against warehouse lenders like those O'Keefe suggested Customers should have asserted against Flagstar, and Stonegate Mortgage should have pursued against Customers. Customers' motion identified Customers' perfected security interest and UCC-1 in all Capital assets. Customers' motion identified Customers' contractual right of set-off to apply any funds, in the name of Capital, to Capital's indebtedness to Customers. Customers' motion identified Customers'

common law right of setoff, as a bank, to apply any funds in the name of Capital to Capital's

indebtedness to Customers. Customers' motion identified that Customers, and all warehouse

lenders with secured facilities with Capital, are immune from claims alleging Customers'

preferential payments and fraudulent transfers from Capital. Customers' motion identified

Courts' rejection of such claims, including cases in which a secured payment to warehouse

lender who knew, or reasonably should have known, of mortgage lender's fraud was not a

fraudulent transfer and a warehouse lender's receipt of payment related to mortgages originated

by fraud participant was not fraudulent transfer or preferential payment. The Commonwealth

Defendants failed to address or respond to the issues in Customers' motion referred to in

Paragraphs 34 or 35 of this First Amended Complaint.

    36.    During the Litigation, the Receiver sought discovery and engaged in motion

practice related to the Horrow Complaint and the Sturdy Complaint. To date, the Receiver has

never filed a Complaint against Customers. To date, the Receiver has never subpoenaed or

attempted to procure formal discovery from Customers.

    37.    On or about April 6, 2015, the Court entered an Order providing:

        1.    All parties who have not been served with a complaint shall
               be served within 10 days of March 30, 2015.

        2.    All motions seeking leave to file amended pleadings shall
               be filed by April 30, 2015.

        3.    All written fact discovery shall be completed by May 4,
               2015.

    38.    The Receiver failed to file any pleadings asserting a cause of action against

Customers prior to any deadlines identified in the April 6, 2015 Order, at which time the

Receiver's Claims against Sturdy and Horrow continued to be the subject of ongoing litigation.

**Customers' Settlement with the Commonwealth Defendants**

39.    Upon the return date of Customers' motion for partial summary judgment against the Commonwealth Defendants, Customers and the Commonwealth Defendants reached a settlement in principal, certain terms of which were placed on the record and later reduced to a confidential writing.  One of the non-confidential terms included Customers' assignment of rights to the Receivership Estate to the Commonwealth Defendants.

**Stonegate Mortgage and the Commonwealth Defendants post-Settlement Conduct**

40.    After the Settlement, counsel for Stonegate Mortgage, Michael Gottschlich, Esq., acting as the agent of Stonegate Mortgage, and counsel for the Commonwealth Defendants, Michael Rowan, Esq., acting as the agent of the Commonwealth Defendants, contacted the Receiver regarding the Maintenance Account.  The communications of the agents of Stonegate Mortgage and the Commonwealth Defendants suggested the Receiver had an obligation to pursue or file a claim against Customers relating to the Maintenance Account.  The communications of the agents of Stonegate Mortgage and the Commonwealth Defendants were made after Customers' production of discovery related to the Maintenance Account in the Litigation and after the Settlement between Customers and the Commonwealth Defendants.  The communications of the agents of Stonegate Mortgage and the Commonwealth Defendants  were made at a time the agents of Stonegate Mortgage and the Commonwealth Defendants knew the Maintenance Account was not an asset of Capital or the Receivership.  The communications of the agents of Stonegate Mortgage and the Commonwealth Defendants were made at a time the agents of Stonegate Mortgage and the Commonwealth Defendants knew Customers had exclusive rights, a perfected security interest, exclusive control, and exclusive possession of the Maintenance Account.

41.    Stonegate Mortgage purchased Capital-originated mortgage loans pursuant to a separate Correspondent Agreement to which Customers was not a party. After the revelation of the Capital fraud, Stonegate Mortgage knowingly recorded Capital-originated mortgages, purchased by Stonegate Mortgage from Capital, in homeowners' properties for which the prior mortgage had never been satisfied. Stonegate Mortgage's conduct resulted in two mortgage liens on innocent homeowners' homes.

After the revelation of the Capital fraud, Stonegate Mortgage knowingly made demand of homeowners on Capital-originated loans, purchased by Stonegate Mortgage from Capital, resulting from the "closings" in which funds were never disbursed and the prior mortgages remained unsatisfied. Stonegate Mortgage's conduct resulted in innocent homeowners receiving demands on two separate mortgage loans. Stonegate Mortgage declinced to convey these mortgages or loans to the Receivership. Stonegate Mortgage's strategy was intended to persuade homeowners to file claims against the Commonwealth Defendants but resulted in certain claims being filed by homeowners against Stonegate Mortgage and the Commonwealth Defendants.

42.    Stonegate Mortgage's assertion of exclusive rights to fraudulently-originated Capital mortgage loans evidences Stonegate Mortgage's unequivocal understanding of Stonegate Mortgage's exclusive rights to the Capital-originated loans pursuant to Stonegate Mortgage's Correspondent Agreement with Capital, rights that are analogous and equivalent to Customers' exclusive rights to the Maintenance Account and collateral.

43.    As a result of the communications of Stonegate Mortgage and the Commonwealth Defendants to the Receiver, on December 19, 2016, the Receiver contacted counsel for Customers, attaching portions of deposition transcripts selected by the Commonwealth Defendants, and stated:

An issue has been brought to my attention involving a transfer by Customers Bank of $1,462,683.46 from Capital Financial Management's maintenance accounts (loan originator funds) on or about April 30, 2013, which is before the Receiver Orders were signed by after the effective date. Would you kindly review this matter with your client and provide me with a written response as soon as practicable.

44.     On the same date of December 19, 2016, Customers responded:

Mike,

The maintenance account was in Capital's name, but without any signing authority or ability to directly access by Capital. Customers' personnel were the only individuals with signing authority, and the only individuals able to access funds. The maintenance account was not a demand deposit account or savings account like the seized accounts at PNC. A copy of the signature card is enclosed.

Even if the account was a demand deposit account, Customers had UCC-1 in "all deposit accounts maintained" in Capital's name. A copy of the filed UCC-1 is enclosed. The UCC-1 perfects Customers' security in the account at issue from bankruptcy trustee, Receiver, etc.

Even without the filed UCC-1, Customers had contractual right of setoff for maintenance account. The relevant portion is in the enclosed Master Repurchase Agreement at pg. Customers 40. NJ enforces contractual right of setoff.

Even without contractual right of setoff, Customers had common law right of setoff for maintenance account. New Jersey enforces common law right of setoff. See, e.g., Keegan v. Estate of Keegan, 179 NJ 242 (Ch. Div. 1981) (recognizing common law right of setoff).

Please let me know if you need any additional information.

Thanks
Tom

45.     The December 19, 2016 communication included a copy of the Agreement, UCC-1, and signature information identifying Customers' exclusive signing authority on the account.

The Receiver shared the information provided by Customers to Stonegate Mortgage and the Commonwealth Defendants. Stonegate Mortgage and/or the Commonwealth Defendants continued to communicate with the Receiver but declined to confirm their knowledge and understanding that the Receiver had no right or claim to the Maintenance Account funds.

46.    On December 28, 2016, Customers wrote the Receiver: "Mike, Do you need anything from us for Sturdy or Horrow? Or anything else for Stonegate Mortgage?" The Receiver responded "I don't think I need anything."

47.    The Receiver took little to no action or further inquiry with regard to the Maintenance Account until January 12, 2017, at which time the Commonwealth Defendants represented to the Court, in writing:

> The Receiver is still attempting to marshal all of the assets that belong to the Receivership estate, which include . . . as we understand, a potential claim by the Receiver against Customers Bank based upon the **fact** that after the Court entered an order freezing any and all accounts held by or for the benefit of Capital, Barnard, or Fili, **Customers Bank liquidated an account it held and managed for the benefit of Capital**, which at the time held approximately $1.4MM. Clearly, until the latter issue is resolved to the satisfaction of the Receiver and the Court, this consolidated matter cannot be closed.

48.    The Commonwealth Defendants' letter's assertion of the "fact" that "Customers Bank liquidated an account it held and managed for the benefit of Customers" was a knowingly false statement, made with the intent to disparage Customers to the Receiver, the Court, and other parties to the Litigation. The Commonwealth Defendants' letter's assertion of the false "fact" was made with the intent to spur the Receiver to file a claim or make a demand on Customers for the Maintenance Account funds, funds that the Commonwealth Defendants knew from the discovery in the Litigation the Receiver had no right or claim.

49.    The Litigation was scheduled for a conference on February 6, 2017.  Originally, the Receiver did not intent to appear at the conference.  However, as a result of the Commonwealth Defendants' January 12, 2017 letter disparaging Customers by falsely representing the "fact" that the Maintenance Account was "for the benefit of Capital," the Receiver felt compelled to appear.  As a result of the Commonwealth Defendants' January 12, 2017 letter disparaging Customers by falsely representing the "fact" that the Maintenance Account was "for the benefit of Capital," counsel for PNC Bank, N.A. represented to the Judge at the February 6, 2017 conference that Customers "misappropriated" funds and demanded a "credit" for the "misappropriated" funds in any calculation of damages.  As a result of the Commonwealth Defendants' January 12, 2017 letter disparaging Customers by falsely representing the "fact" that the Maintenance Account was "for the benefit of Capital," the Receiver felt compelled to obtain a release from Stonegate Mortgage and the Commonwealth Defendants, and, in the absence of such a release, file a claim against the Maintenance Account.  The Receiver's understanding that either a Release or further action on the part of the Receiver were necessary were not informed by any genuine belief that the Receiver had a right or claim to the funds but, rather, in response to the disparaging communications of the Commonwealth Defendants, including the written letter misrepresenting the "fact" that the Maintenance Account was "for the benefit of Capital."  The Receiver advised the Court at the February 6, 2017 conference of the issue of a release of the Receiver from Stonegate Mortgage and the Commonwealth Defendants, who declined to execute a release regarding the Maintenance Account funds they knew would never be an asset of the Receiver.

50.    In anticipation of the issue being raised at the conference, on January 12, 2017, the Receiver wrote to counsel for Customers:

Please review to make sure that the below bullet points accurately reflect your position. Thank you.

- The Receiver Orders cannot simply trump a perfected secured creditor.
- The Receiver is like a trustee in bankruptcy; as such the Receiver cannot remove a perfected secured claim of a creditor.
- The sources of funds for the maintenance account came from Capital; however, once the funds were transferred they became exclusively the assets of Customers Bank pursuant to the maintenance agreement.
- Capital never ever had any rights to these funds, the Receiver does not acquire greater rights then the debtor.
- Customer's initial loss claim was in excess of 4 million. That claim was reduced by the maintenance account setoff. Consequently, at the time Customer negotiated in good faith to settle matter with Commonwealth/Fidelity, Customers was negotiated based upon the disclosure made to all that they had recovered monies from the setoff.
- Believes that the Receiver is out of time to make a claim for the maintenance account funds. The setoff was disclosed during the early phase of discovery (end of 2013 or early 2014), and neither Commonwealth/Fidelity nor Stonegate Mortgage alerted the Receiver to potential source of Receivership asset until after settlement negotiations had concluded and shortly before the February trial date with PNC.

51.    To date, the Receiver has not articulated any legal or factual basis supporting a claim by the Receiver to the Maintenance Account funds but has continued to be in communication with Stonegate Mortgage and the Commonwealth Defendants, neither of whom have "released" the Receiver from filing a claim or articulated any factual or legal basis for the Receiver's "claim" to the Maintenance Account.

52.    As a result of the disparaging communication by the Commonwealth Defendants identifying the "fact" that the Maintenance Account was "for the benefit of Capital," Mark Catanzaro, Esq., ("Catanzaro") communicated with the Receiver to inquire about the Receiver's intent with respect to the Maintenance Account. Catanzaro's communications were the result of

the Commonwealth Defendants' disparaging communication identifying the "fact" that the
Maintaince Account was "for the benefit of Capital." As a result of Catanzaro's
communications, the Receiver felt a further obligation to obtain a release or pursue a misguided
claim against Customers that was not informed by any genuine understanding or review of the
discovery or the law, but was solely the result of the communications of Stonegate Mortgage
and/or the Commonwealth Defendants to unduly influence the Receiver to pursue an issue
Stonegate Mortgage and the Commonwealth Defendants knew had no factual or legal basis.

53.    As a result of the Commonwealth Defendants' disparaging communication
identifying the "fact" that the Maintenance Account was "for the benefit of Capital," along with
the communications of Stonegate Mortgage to the Reciver, on March 15, 2017, the Receiver
applied for "disgorgement" of the Maintenance Account funds. The Receiver's motion,
originally marked returnable on March 31, 2017, initially required an eight (8) day response.
The Receiver's motion was a *de facto* motion for summary judgment in excess of $1 million in a
matter in which no pleadings been undertaken, no legal basis was asserted, and no formal claim
had been filed identifying any causes of action, claims, or legal rights of the Receiver against
Customers related to Customers' exclusive collateral and security interest in the form of the
Maintenance Account funds.

54.    Although the Receiver had previously filed Complaints against Horrow and
Sturdy, the Receiver elected to circumvent the judicial process with the *de facto* motion for
summary judgment filed as a result of the disparaging communication by the Commonwealth
Defendants and the ongoing communications between Stonegate Mortgage and the Receiver.
The *de facto* motion for summary judgment included no Statement of Undisputed Facts pursuant
to R. 4:46-2, no brief, no causes of action, no theories of recovery and no legal authority. The *de*

*facto* motion for summary judgment failed to include copies of the underling Master Repurchase

Agreement, Maintenance Account records, or Customers' UCC-1. The *de facto* motion for

summary judgment failed to include any deposition testimony regarding the Maintenance

Account. The *de facto* motion for summary judgment was not filed for the proper purpose of

pursuing a valid claim but, instead, was filed to assuage the Receiver's concerns about Stonegate

Mortgage and the Commonwealth Defendants failing to release the Receiver of any claims

related to the Maintenance Account.

55.    The Receiver advised that Stonegate Mortgage and the Commonwealth

Defendants wanted to review the motion for "disgorgement" prior to the Receiver's filing,

evidencing the continuing attempts of Stonegate Mortgage and the Commonwealth Defendants

to use the Receiver as their "proxy" for filing a baseless claim.

56.    Following the February 6, 2017 conference, Customers contacted Gottschlich

regarding Customers' intent to file a lawsuit against Stonegate Mortgage for attempting to

tortiously interfere with Customers' collateral. Gottschlich attempted to disavow knowledge of

the Maintenance Account funds prior to the fall of 2016. Gottschlich claimed Francis X. Riley,

III, Esq., raised the issue to Gottschlich in the fall of 2016, prior to which time Gottschlich

claimed to have no knowledge of the Maintenance Account funds. Gottschlich, ignoring the

years of discovery related to the Maintenance Account in which Stonegate Mortgage actively

participated, as well as his own suggestions on how Customers should apply Maintenance

Account funds as part of litigation strategy, claimed that Stonegate Mortgage was unaware of the

Maintenance Account prior to the Commonwealth Defendants making inquiry in late 2016.

57.    Following the February 6, 2017 conference, Customers filed an Order to Show

Cause alleging the Commonwealth Defendants' breach of the Stipulation of Settlement. The

Order to Show Cause sought leave of Court to disclose the confidential Settlement Agreement between Customers and the Commonwealth Defendants, including the provision Customers alleges the Commonwealth Defendants have breached and continue to breach. The Order to Show Cause set forth the factual background of the Maintenance Account and multiple legal theories under which Customers had exclusive rights to its collateral. No party asserted any factual or legal disputes to Customers' claim to exclusive rights to the Maintenance Account.

58.    Following Customers' filing of the Order to Show Cause, the Receiver advised Customers that Rowan and Gottschlich contacted the Receiver and Rowan requested the Receiver execute a certification, prepared by Rowan. Upon learning of the Commonwealth Defendants' preparation of certifications for the Receiver, Customers sent written notice that Customers would subpoena and depose the Receiver in the presence of all interested parties. The Court denied Customers' Order to Show Cause, finding Customers had not identified any irreparable harm to qualify for injunctive relief.

59.    Upon receipt of the Receiver's *de facto* motion for summary judgment, Customers served a subpoena on the Receiver for communications and information related to the representations in the Receiver's certification. Stonegate Mortgage and the Commonwealth Defendants immediately objected, ostensibly due to their concerns about the revelation that the Receiver's *de facto* motion for summary judgment was not based on any independent legal analysis undertaken by the Receiver and not based on any objectively reasonable belief by the Receiver of any right to the Maintenance Account funds, but was due to the Receiver's concern about the ongoing communications from Stonegate Mortgage and the Commonwealth Defendants, including the Commonwealth Defendants' disparaging communication that the Maintenance Account was "for the benefit of Capital."

60.     In addition to the misleading representations suggesting the Receiver had a "claim" or "right" to the Maintenance Account funds, Stonegate Mortgage has suggested to the Receiver that Customers could have "waived" its security interest at the outset of the litigation by conveying the Maintenance Account funds to the Receivership and then filing a "claim" for reimbursement of those funds from the Receivership Estate.  Stonegate Mortgage's theory for Customers to relinquish its contractual rights, common law rights, statutory rights and seek "reimbursement" from the Receivership is a procedure without any legal or factual basis.

61.     In addition to the unsupported "procedure" outlined in Paragraph 60 of this First Amended Complaint, Stonegate Mortgage has suggested to the Receiver that if the Maintenance Account funds are transferred to the Receivership Estate, Customers can recover funds from PNC Bank, a remaining defendant in the Litigation, in the value of any Maintenance Account funds conveyed to the Receivership.  Stonegate Mortgage's communication evidences further disregard for the underlying facts and law, and its continuing efforts to utilize the Receiver for a misguided claim.  Stonegate Mortgage is attempting to use the Receiver to file this misguided action based on Stonegate Mortgage's dissatisfaction with the result of the Litigation.

## COUNT ONE
### THE COMMONWEALTH DEFENDANTS
### BREACH OF SETTLEMENT

62.     Customers hereby incorporates the matters set forth in Paragraphs 1-59 as if set forth at length herein.

63.     The Commonwealth Defendants' disparagement of Customers to the Court and the Receiver is a violation of the Settlement Agreement.

64.     As a result of the Commonwealth Defendants' disparagement of Customers, the Receiver filed a baseless, *de facto* claim against Customers.

65.     As a result of the Commonwealth Defendants' disparagement of Customers, Customers has incurred losses, including loss of reputation and attorney's fees for responding toe the Receiver's motion by filing a Declaratory Judgment action against the Receivership.

66.     As a result of the Commonwealth Defendants' disparagement of Customers, the Commonwealth Defendants have breached the Settlement and waived any rights contained therein.

**WHEREFORE,** Customers Bank, request judgment against the Commonwealth Defendants for compensatory, consequential and related damages as well as attorney fees and any costs the court deems just.

## COUNT TWO
### STONEGATE MORTGAGE AND HOME POINT
### TORTIOUS INTERFERENCE WITH CONTRACT

67.     Customers hereby incorporates Paragraphs 1-66 as if set forth at length herein.

68.     After the Settlement, Stonegate Mortgage's agents, Michael Gottschlich, Esq. and Joseph Garemore, Esq., engaged in an attempt to coerce, intimidate, influence and harass the Receiver, Michael Joyce, Esq. into filing a factually and legally meritless claim against Customers.

69.     The purpose of the communications of Gottschlich and Garemore was not for the Receiver's investigation and pursuit of any legally recognized rights, but rather an attempt to recover funds due to Stonegate Mortgage's dissatisfaction with its recovery from the Litigation to date by using the Receiver as a "proxy" to intimidate and harass Customers in an effort to compel an offer of settlement and compromise by Customers regarding a "claim" for which Stongate knows Customers has no liability.

70.   Gottschlich has since contended that the individuals who attempted to communicate with the Receiver to compel the baseless investigation and claim regarding the Maintenance Account were Francis Riley, III, Esq. and Rowan, acting as the agents of Commownealth and Fidelity.

71.   Gottschlich and Garemore, as the agents of Stonegate Mortgage, have attempted to compel the Receiver to file a baseless claim to the Maintenance Account by Customers.

72.   Gottschlich and Garemore were aware, at all times, that neither Capital nor the Receiver had any right or claim to the Maintenance Account funds. Gottschlich is not a member of New Jersey Bar but was admitted *pro hoc vice*. As part of his admission to the Superior Court of New Jersey, Gottschlich was to comply with all New Jersey <u>Court Rules</u> and the <u>Rules of Professional Responsibility</u>, including  Gottschlich has contended that the misleading communications to the Receiver were undertaken by the Commonwealth Defendants.

73.   Upon information and belief, Stonegate Mortgage has attempted to use the Receiver as a "proxy" to file a baseless claim and attempt to tortiously interfere with Customers' exclusive contractual rights to the Maintenance Account funds that Stonegate Mortgage knows neither Capital nor the Receiver have claim or rights.

74.   Stonegate Mortgage knew of Customers' agreement with Capital and exclusive rights to the Maintenance Account.

75.   Stonegate Mortgage has wrongfully interfered with Customers' agreement with Capital by utilizing the Receiver as a "proxy" to file a misguided claim with no factual or legal basis.

76.     It is reasonably probable that the Receiver's *de facto* motion was the result of Stonegate Mortgage's communications with the Receiver and attempt to hinder Customers' rights.

77.     As a result of Stonegate Mortgage's interference, Customers has suffered damages.

**WHEREFORE,** Customers Bank, requests judgment against Stonegate Mortgage and Home Point, as the successor-in-interest to Stonegate Mortgage, for compensatory, consequential and related damages as well as attorney fees and any costs the court deems just.

## THIRD COUNT
### INTEFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE
### STONEGATE MORTGAGE MORTAGE AND HOME POINT

Plaintiff hereby incorporates each of the allegations in Paragraphs 1-77 as if set forth herein at length.

78.     Customers has a reasonable expectation of economic advantage with respect to the Maintenance Account and its exclusive rights thereto.

79.     Stonegate Mortgage has interfered, intentionally and without justification or excuse, with Customers' exclusive rights to the Maintenance Account by attempting to coerce and influence the Receiver to file a motion for "disgorgement" that Stonegate Mortgage knows has no factual or legal basis.

80.     A certainty, not a mere reasonable probability, exists that Customers has the exclusive rights to the Maintenance Account funds and the economic benefits therein.

81.     Stonegate Mortgage has attempted to interfere with Customers' certainty as to its exclusive rights to the Maintenance Account funds.

WHEREFORE, Customers Bank demands judgment against Stonegate Mortgage and Home Point, as the successor-in-interest to Stonegate Mortgage, for compensatory, consequential and related damages as well as attorney fees and any costs the court deems just.

### FOURTH COUNT
### CONSTRUCTIVE FRAUD
### STONEGATE MORTGAGE AND HOME POINT

Plaintiff hereby incorporates each of the allegations in Paragraphs 1-81 as if set forth herein at length.

82.    The actions and inactions of Stonegate Mortgage constitute constructive fraud, as a result of which Customers has suffered damages.

WHEREFORE, Customers Bank demands judgment against Stonegate and Home Point, as successor-in-interest to Stonegate Mortgage, for compensatory damages, consequential damages, attorney fees and any relief supports deems just and equitable.

SALDUTTI LAW GROUP


ROBERT L. SALDUTTI, ESQUIRE
THOMAS B. O'CONNELL, ESQUIRE

Dated:  March 22, 2017

## CERTIFICATION PURSUANT TO R. 4:5-1

Pursuant to R. 4:5-1 there is a relative matter pending in Camden County under Docket No. DJ-120477-13. This matter has been consolidated with Camden County under Docket Nos. L-2482-13; L-1675-13; L-3910-13; and L-3221-13.

Michael Joyce, Esq., as Receiver has filed a Complaint in Camden County under Docket No. L-4747-13.

Sturdy Bank has filed a Foreclosure Action in the matter of <u>Sturdy Bank v. 670 First Avenue. LLC.</u> Docket No. CPM-F-020577-13 ("the Foreclosure Action").

Colonial Mortgage Service Company of America has filed an action against Commonwealth Land Title Insurance Company in <u>Colonial Mortgage Service Company of America v. Commonwealth Land Title Insurance Company.</u> United States District Court, Eastern District of Pennsylvania, Case No. 2-.14-CV-03807-JHS.

David Fili filed for bankruptcy in the matter of <u>In re: David Fili.</u> Debtor, Chapter 7, Case No. 14-16187, United States Bankruptcy Court, Eastern District of Pennsylvania (Philadelphia).

Customers Bank filed an Adversary Complaint for non-dischargeability of David Fili's debt to Customers in the matter of <u>Customers Bank v. Fili.</u> Adversary Proceeding No. 14-00606, United States Bankruptcy Court, Eastern District of Pennsylvania (Philadelphia).

Customers Bank has filed a declaratory judgment action against the Receiver that has not yet been assigned a docket.

## CERTIFICATION PURSUANT TO R.1:38-7

I hereby certify that confidential personal identifiers have been redacted from documents now submitted to the court, and will be redacted from all documents submitted in the future in accordance with Rule 1:38-7(b).

SALDUTTI LAW GROUP

ROBERT L. SALDUTTI, ESQUIRE
THOMAS B. O'CONNELL, ESQUIRE

Dated:  March 22, 2017